[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for a divorce brought by the plaintiff wife against the defendant husband. The parties were married in 1978 in Milford, Connecticut. There is one child adopted by the parties in 1980 whose name is Winter and he was born May 15, 1980. Both parties were married before, the plaintiff three times and the defendant twice. The plaintiff had two children by one of her former marriages who were living with her at the time of this marriage, but when she married the defendant, they moved in with their father. They later came back to live with their mother and the defendant when they were both in high school.
The parties have agreed to joint custody of their son, CT Page 11403 Winter, with physical custody with the mother and liberal rights of visitation with the father. The other children have reached the age of maturity at this point and are not a part of this action.
This appears to have been a bizarre marriage. At the time of the marriage, the plaintiff owned a house in Milford and the parties lived there a short while but the defendant wished to have a house on the water because he was interested in using a boat. The plaintiff then sold her house and used the proceeds of some $24,000 for a down payment on a house on the Housatonic River, which is the present marital home. It is not clear how much the defendant put down, anywhere from $1,000 to $5,000. Thereafter the defendant paid the mortgage, reducing it from some $42,000 to $30,000 or $35,000, depending on which affidavit you accept as valid. He, of course, also paid the interest on the mortgage during this 16 year marriage.
While both parties worked, the defendant for a while worked two jobs at the Hitchcock Marina and at a bar which he later bought. He has since sold the bar for some $40,000, $30,000 of which was used to repair the house — after this action was brought.
The plaintiff is currently working in the office of Oronoque Orchards Golf Course at a wage of $6.00 an hour, and she now works 40 hours. Prior to the marriage, she also had worked in various capacities as a nurse's aide and veterinary doctor's aide. During the marriage, she left for about a year and three months to go to Florida where she went to school and received a certification as a surgical aide. However, she found, after doing the work both in Florida and New Haven, that she was unable to lift the patients because of back problems and was also unable to tolerate treatment from the doctors.
While it is not clear why the plaintiff took off for Florida for a year and three months, she did testify to conditions which would appear to be intolerable; to wit, the defendant's drinking and womanizing as well as his apparent destruction of most of the house in the guise of remodeling. None of this was denied by the defendant. In fact, the defendant offered as his reason for the destruction that he would start to remodel one room or another at the request of the plaintiff but would then never finish it. In fact, the only attempt at finishing the rooms was done after the divorce was brought. Within the last year, the kitchen was CT Page 11404 finally finished so that there was a sink and cabinets were installed. Up until that time, the dishes all had to be washed in the bathroom where there was a sink. See exhibit A15.
There was also evidence that the defendant had infected the plaintiff with a venereal disease prior to her going to Florida. Nevertheless, at the defendant's request, the plaintiff returned to Connecticut and took up residence with the defendant after a year and three months in Florida. She then started to work in New Haven as a surgical aide but found it too stressful for the reasons stated above and quit. She then worked other jobs including that of a veterinarian's assistant until she secured her present job working in the office of the Oronoque Village Golf Course.
The defendant, on the other hand, has sold the bar which he used to operate and is presently working at the Hitchcock Marina earning $14 or $15 an hour as his regular pay. He did not include overtime which he does get, particularly during the summer months, in his affidavit. He has a history of not paying bills on time so that both the house was threatened with foreclosure until he finally brought the mortgage up-to-date this year and the utilities were threatened with being cut off because he failed to pay the bills as he had been ordered to do so in the pendente lite orders. His affidavit leaves something to be desired both with respect to his income, which had omitted the overtime, and also with respect to his interest in a boat, which value now appears to be greater than what he listed, that is, $10,000 instead of $6,000. The defendant now owes it appears $2500 in order to have sole ownership of the boat, which had originally been purchased with a partner.
It is also clear that the defendant has always been able to come up with money when he had to, both to pay off the mortgage and the utilities, to give the stepdaughter $5,000 tuition for her school, to buy a used car for his stepson and the like. It may be, however, that these were all done when he was running the bar and had a substantial cash flow, the amount of which, the plaintiff claims, was at least $1500 a week. He no longer has the bar and he appears to be working only one job although the plaintiff claims that he works overtime and he has some private work on the side. However, the evidence was not strong enough to establish that.
The only assets of the parties consist of the jointly owned CT Page 11405 marital home valued at $170,000 by the plaintiff and a $150,000 by the defendant, with the plaintiff saying the mortgage is $30,000 and the defendant saying it is $35,000. They also have two cars, both relatively old, a SAAB, belonging to the plaintiff, and a Cadillac, belonging to the defendant.
Both parties agree that the child should remain with the mother, as indicated above, and that the plaintiff should have exclusive use of the marital home until it is sold or until the plaintiff is able to pay the defendant what the court finds to be his share. The plaintiff wants ten years for this purpose with the title going to her immediately. The defendant wants until the child is 18, which is 1998, and makes no demand about who should own the house only that when it is sold, the defendant should get half of the net proceeds. The parties have been living apart since May of this year with the plaintiff in sole possession of the house and the child living with her.
While much has been made of the fact that the plaintiff owns two potbellied pigs who sleep in her bedroom and who have, on occasion, opened the cabinet doors and taken food out, the pigs did not appear until after the divorce was brought. There are five cats and two dogs on the premises, one of the dogs belonging to the child. They appear not to have caused as much concern between the two parties as the pigs have, but the pigs' presence is irrelevant as far as this action is concerned because of the fact that they did not appear until after the divorce was brought and after the marriage had already broken down.
The breakdown of the marriage appears to have been caused primarily by the defendant's conduct as set forth above. The last straw was that, upon returning from Florida and proceeding to live in the house with the defendant again and having resumed marital relations on one occasion, the plaintiff was again infected with a venereal disease. In addition, the defendant continued drinking and womanizing.
Consequently, the defendant must be held responsible for the breakdown of the marriage, and the court so finds.
In addition to the above, the court makes the following findings and orders:
1. The parties were married on June 9, 1978. The marriage has broken down irretrievably with no hope of reconciliation and CT Page 11406 it is hereby dissolved.
2. At least one of the parties has lived in the State of Connecticut for one year prior to the filing of this action; therefore, the court has jurisdiction.
3. There is one minor child adopted by the parties born May 15, 1980.
4. No federal, state or local agency has provided support for either of the parties or their son.
5. SUPPORT: Defendant shall pay to the plaintiff the sum of $113 a week as support for the minor child on the basis of the earnings he sets forth in his affidavit.
6. ALIMONY: In determining the alimony, the court has taken into consideration the overtime which the defendant admitted working during the summer and perhaps the spring as well and the fact that he is presently receiving $560 a month up to a total of $2500, which is part of the purchase price of the bar which he sold. The court also takes into account the defendant's ability to come up with money to pay off the mortgage, utilities and back support. On this basis, the court orders the defendant to pay to the plaintiff the sum of $100 a week as alimony until her death, remarriage or cohabitation within the meaning of the statutes.
7. DISTRIBUTION OF ASSETS: The plaintiff shall have exclusive possession of the marital home for at least five years. During that time, the defendant shall pay thirty-five (35%) percent of the mortgage and utilities not including the telephone and the plaintiff shall pay sixty (65%) percent thereof. At the end of the five years, the house may be sold at the plaintiff's option, and the net proceeds thereof, after payment of all costs attributable to the sale of the house, shall be distributed sixty-five (65%) percent to the plaintiff and thirty-five (35%) percent to the defendant. Should the plaintiff not wish to sell the house at that time, she must then pay the defendant thirty-five (35%) percent of the equity in the house to be determined as follows: each party shall appoint a broker to make an assessment of the value of the house; if they cannot agree, then they together shall select a third broker who will make the determination as to the house's value and the amount of equity therein CT Page 11407 given the amount of the outstanding mortgage and liens. On the basis of that figure, then the plaintiff will be liable to pay the defendant thirty-five (35%) per cent of that amount.
 Once the defendant receives his share of the equity, he shall transfer all his right, title and interest in the marital home to the plaintiff. Upon completion of the transfer, the plaintiff shall be responsible for the mortgage, utilities and all the expenses of maintaining the house. Prior to the transfer, the defendant shall make sure that his share of the mortgage, taxes, utilities, etc., are up-to-date and pay any balance thereof due at that time.
5. HEALTH BENEFITS: The defendant shall include his son in the health benefits which his employer provides. He shall also be equally responsible for two-thirds of any unreimbursed medical bills; that is, those not covered by insurance for the son, Winter.
 The defendant shall also provide health insurance coverage for three years for the plaintiff to the extent she would have been covered had he elected to include her in his policy provided by his employer. The plaintiff shall pay one-half of the cost thereof.
7. AUTOMOBILES: Each party shall retain ownership of his or her automobile, the plaintiff the SAAB and the defendant the Cadillac. If it is necessary for either party to sign papers to transfer ownership of either car to the other, each party is ordered to do so.
8. LIABILITIES: Each party shall pay the debts listed on his or her affidavit.
9. PERSONAL PROPERTY: The plaintiff shall be entitled to ownership of all the furnishings presently in the house.
10. WAGE EXECUTION: A wage execution order shall issue.
MARGARET C. DRISCOLL STATE TRIAL REFEREE CT Page 11408